IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

DOMINIC JOHNSON,

                Plaintiff,

    v.                                       OPINION and ORDER

JOSH KOSNICK, KOSNICK FINANCIAL GROUP,        21-cv-696-wmc
INC. and ABC INSURANCE COMPANY,

                Defendants.

---

For several years before resigning, plaintiff Dominic Johnson worked as a financial advisor with defendants Josh Kosnick and Kosnick Financial Group. Johnson claims that while working with defendants, he faced race discrimination, retaliation and a hostile work environment that forced him to end his contract with defendants, all in violation of 42 U.S.C. § 1981. Defendants have moved for partial summary judgment on Johnson's claims of retaliation and constructive discharge. (Dkt. #11). For reasons explained below, the court finds that defendants are entitled to judgment under the very demanding proof applicable to Johnson's constructive discharge claim, but not as to his retaliation claim.

UNDISPUTED FACTS[1]

## A. The Parties

Defendant Kosnick Financial Group (KFG) operates a branch office for Northwestern Mutual Life Insurance Company in Middleton, Wisconsin, and provides financial consulting and related services in and around Dane County, Wisconsin. Defendant Josh Kosnick was managing partner of KFG at all relevant times, which was the highest leadership role in Northwestern Mutual's branch leadership team. Below the managing partner is a managing director, who was responsible for managing a satellite office outside of the KFG principal branch office; below the managing director is the district director, who worked within the KFG branch office; and the growth and development director and field director are below the district director.

As managing partner of the Middleton office, Kosnick decided which financial advisors were appointed to which leadership roles within Northwestern Mutual's branch office framework. He also had the sole authority to provide financial advisors with contracts, resources and new recruits to mentor and develop.

Plaintiff Dominic Johnson is an African-American and biracial man who began working as a financial advisor selling Northwestern Mutual policies and products with KFG in February 2017. Kosnick interviewed and offered Johnson a financial advisor contract. During the interview, Kosnick told Johnson that it would be nice to have a Black advisor in the office, and because of Kosnick's association with Black people, that Kosnick was

---

[1] The following facts are drawn from the parties' proposed findings of fact and responses, as well as the audio recordings provided to the court. These facts are undisputed unless otherwise noted, and additional facts are also discussed as they become relevant to the analysis below.

himself called a "light skinned brother."  During his time with KFG, Kosnick approved each of Johnson's subsequent promotions to field director, then growth and development director, and finally to district director.  However, according to Johnson, Kosnick required him to recruit more, new financial advisors to KFG than was required of any other financial advisor seeking a promotion.

## B.  Lake Geneva Incident

In December 2018, shortly after Johnson's promotion to growth and development director, Kosnick held a planning event with KFG's leadership team in Lake Geneva, Wisconsin.  The team stayed together at a house, and one evening they played a drawing game together.  During the game, Kosnick drew a picture of a horse graphically having sex with a stick figure, to which he wrote the words "Horse show."  To make a bad matter worse, the stick figure's face was colored in with black marker, and another member of the KFG leadership team changed the caption on the picture to "Horse fucking Ebony."

While other individuals present were laughing at the picture, Johnson was understandably upset, telling the leadership team that the drawing was racist and seriously offensive, especially with the addition of "Ebony" unambiguously describing a Black woman.  As Johnson further explained, such a depiction could be associated with his family, including his daughter, his fiancée or his grandmother.  Kosnick then asked Johnson, "What, you don't watch ebony porn?"  Another member of the leadership team then offered that "ebony porn" was his favorite porn tag.  Finally, when Johnson asked Kosnick how he would feel if this was his family and a representation of someone who was white,

3

Kosnick responded by asking whether it would be okay if it was a Black man with a white woman.  At that point, Johnson stated that he was offended by the entire conversation and he left.

About a week later, Johnson and Kosnick discussed the Lake Geneva incident.[2] Johnson told Kosnick that he was deeply offended by the racist drawing, and the response from the KFG leadership team, including Kosnick, had made the situation worse.  Kosnick admitted that he failed as a leader and should not have drawn the picture.

## C. African American Affinity Summit

Some ten months later, in October 2019, Johnson attended Northwest Mutual's African American Affinity Summit in Miami, Florida.  At a closed-door session with Black leaders, managing directors, and growth and development directors from Northwest Mutual, Johnson complained about being subjected to racial discrimination by Kosnick. The parties agree that Johnson asked that group for support for mistreatment and an unmanageable work environment, but neither side provides details about Johnson's specific complaints.  Johnson did tell Northwestern Mutual's chief diversity executive and an African American growth and development director about the Lake Geneva incident in particular.

Although the record is silent as to how, Kosnick later learned about Johnson's statements at the African American Affinity Summit. Kosnick was upset, felt like he had

---

[2] Johnson recorded this conversation on his phone and filed it with the court.  (Dkt. #22-1.)

4

been accused of racism unfairly, and thought that Johnson was trying to ruin his reputation.  He also felt like he could not trust Johnson, and he asked his leadership team whether he could terminate him.  Ultimately, Kosnick decided not to terminate Johnson, but instead met with him to discuss what had happened at the African American Affinity Summit on October 28, 2019, with Michael Ortiz, a Northwest Mutual home office employee present as well to address Johnson's position at KFG moving forward.  That same group met again to discuss the incident in November 2019.

During these discussions, Kosnick expressed his hurt and sense of betrayal by Johnson's comments about him to others.  In turn, Johnson requested that he be made a managing director so that he could manage his own office away from KFG.  Kosnick, Ortiz and Johnson discussed a plan for Johnson to become a managing director.  Kosnick agreed to recommend Johnson for that position *after* Johnson: (1) had conversations with the other managing directors that Kosnick supervised; (2) reviewed projections for the managing director position from the Northwest Mutual home office; (3) worked on his relationship with Kosnick; and (4) recruited six individuals in a twelve-month period.  Both Kosnick and Johnson understood that the timeline and appointment of a managing director at KFG was ultimately up to Kosnick.

### D. Johnson Leaves KFG

By the fall of 2020, Johnson had completed all of the steps that he had discussed with Kosnick and Ortiz for becoming a managing director, but Kosnick had only promoted Johnson to the position of district director, not managing director.  Johnson met with

Kosnick on February 5, 2021, to discuss his continuing desire to be promoted to a managing director. During that conversation, Kosnick told Johnson again that he had felt betrayed by Johnson's previous actions, and he sometimes worried that Johnson would do it again. Still, he also expressed his desire for Johnson to remain part of KFG, and said that he wanted eventually to make Johnson a managing director. Kosnick then said that he did not think Johnson was ready at that time to become a managing director, and he had just renewed his Middleton lease for two more years, with his goal being to promote Johnson to managing director at the end of that two years.

After that conversation, Johnson concluded that Kosnick was holding him back and he could no longer work with KFG. Johnson tried to find another position within Northwest Mutual. When he was unable to do so, Johnson ultimately resigned from KFG on February 18, 2021.

OPINION

Section 1981 prohibits intentional race discrimination in the making or enforcing of a contract. *Morris v. Office Max, Inc.*, 89 F.3d 411, 413 (7th Cir. 1996). Plaintiff contends that defendants violated § 1981 by: (1) discriminating against him because of his race; (2) retaliating against him after he complained about racism; and (3) subjecting him to a hostile work environment that forced his resignation (a so-called "constructive discharge"). Defendant has moved for summary judgment on plaintiff's retaliation and constructive discharge claims.

## I. Retaliation

Plaintiff contends that after he complained about racial discrimination at KFG, Kosnick retaliated against him by refusing to promote him to a managing director position. To survive summary judgment on his retaliation claim, plaintiff must show evidence that: (1) he engaged in statutorily protected activity; (2) he suffered an adverse employment action; and (3) there is a causal link between the two. *Oliver v. Joint Logistics Managers, Inc.*, 893 F.3d 408, 413 (7th Cir. 2018).

Defendants do not dispute whether plaintiff's complaints to Kosnick and other KFG and Northwestern Mutual personnel about the Lake Geneva incident (and of other perceived incidents of racism at KFG) qualified as "statutorily protected activity." Nor do defendants dispute whether being denied a promotion to managing director based on that protected activity could constitute "an adverse employment action." Therefore, the court assumes for purposes of summary judgment that plaintiff can satisfy the first and second elements of his retaliation claim.

All of defendants' arguments at summary judgment focus on the third element of retaliation: whether Kosnick declined to promote plaintiff to the position of managing director at KFG in retaliation for his complaints about race discrimination in the workplace. Defendants contend that plaintiff's evidence does not satisfy this element for three reasons. First, defendants argue that Johnson was not qualified for the position of managing director because by October or November 2020, he had not taken two examinations that were required for the position. This argument fails, however, because defendants have presented *no* evidence regarding these examinations, including what they

are, whether Johnson had taken them by February 2021 when he resigned, how soon he could have scheduled and sat for the examinations if Kosnick had agreed to promote him, or whether either examination actually played any role in Kosnick's decision to promote someone to managing director.

Second, defendants argue that plaintiff cannot succeed on a retaliation claim because he has failed to identify a similarly situated employee who had not engaged in a protected activity *and* received more favorable treatment. In particular, they argue that no other employee was promoted to managing director around the same time that plaintiff sought the position, and employees who had previously been promoted had substantially more experience with KFG and Northwest Mutual than plaintiff. However, plaintiff is not required to identify a similarly situated individual to succeed on his retaliation claim; rather, he must only submit enough evidence from which a reasonable fact-finder could conclude that defendants subjected him to an adverse employment activity because of his complaints about racism at KFG. *See Runkel v. City of Springfield*, 51 F.4th 736, 742 (7th Cir. 2022) (relevant inquiry at summary judgment is "whether a reasonable jury could find that the relevant decision was motivated in part by an unlawful criterion" after considering all the evidence presented).

Plaintiff has met this burden here. In particular, a reasonable jury could conclude that Kosnick refused to promote plaintiff because of his complaints of racism based on evidence that Kosnick was furious about plaintiff's complaints, felt hurt and betrayed, wanted to terminate plaintiff, and refused to promote plaintiff despite his meeting specifically enumerated criteria for the promotion. *See Ortiz v. Werner Enters., Inc.*, 834

F.3d 760, 765 (7th Cir. 2016) (at summary judgment, the plaintiff must present evidence which, "considered as a whole," "would permit a reasonable factfinder to conclude that the plaintiff's race [or protected conduct] ... caused the [adverse employment action].").[3]

Finally, defendants argue that Kosnick has identified a legitimate, non-discriminatory reason for refusing to promote Johnson:  his lack of experience in managing his own office and other people.  To survive summary judgment, however, plaintiff need only offer evidence from which a reasonable jury could conclude that Kosnick's proffered reasons for denying the promotion are pretexual.  *See E.E.O.C. v. Target Corp.*, 460 F.3d 946, 960 (7th Cir. 2006) (to survive summary judgment, "the plaintiff need only offer evidence that supports an inference that the employer's nondiscriminatory reason for its action was dishonest").  Johnson has presented evidence that more than one year before Kosnick refused to promote him, he had set forth specific requirements for Johnson to become a managing director, and Kosnick did *not* suggest to Johnson that he would deny the promotion based on lack of experience.  A reasonable jury could find from this that Kosnick's subsequent refusal to promote Johnson on the ground that he lacked experience was pretexual.  Therefore, defendants are not entitled to summary judgment on Johnson's retaliation claim.

---

[3] The court notes that defendants stated multiple times in their summary judgment materials that, "Johnson was the youngest and fastest-appointed African American District Director in the entire Northwestern Mutual system" (dfts.' Br. (dkt. #12) 16), suggesting that this fact undermines Johnson's discrimination claim.  However, comparing Johnson's promotion to that of other African American financial advisors is *not* the correct comparator when evaluating a discrimination claim.  Rather, the relevant question is Johnson's relative progress and promotions compared to those of *white* financial advisors in the Northwestern Mutual system.

II.     **Constructive Discharge**

Plaintiff also contends that he was constructively discharged from his position with KFG.  However, a constructive discharge occurs only when the plaintiff can show that his working conditions had become so intolerable that he was forced to resign.  *Pennsylvania State Police v. Suders*, 542 U.S. 129, 147 (2004).  The Court of Appeals for the Seventh Circuit has recognized two forms of constructive discharge: (1) when a plaintiff resigns due to alleged discriminatory harassment; and (2) when an employer "acts in a manner so as to have communicated to a reasonable employee that she will be terminated, and the plaintiff employee resigns[.]"  *Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 679–80 (7th Cir. 2010) (quoting *E.E.O.C. v. Univ. of Chicago Hosps.*, 276 F.3d 326, 332 (7th Cir. 2002)).

Plaintiff's constructive discharge claim is of the first variety, as he claims that the working environment at KFG was so toxic that he had to resign.  To succeed on this form of constructive discharge claim, plaintiff first must show that he was subject to a "hostile work environment," which has been defined by case law as meaning that the plaintiff was: (1) subject to unwelcome harassment; (2) the harassment was based on race (or another protected category); and (3) the harassment was severe or pervasive to a degree that altered the conditions of employment and created a hostile or abusive work environment. *Robinson v. Perales*, 894 F.3d 818, 828 (7th Cir. 2018).  Relevant to this inquiry is "the severity of the alleged conduct, its frequency, whether it [wa]s physically threatening or humiliating (or merely offensive), and whether it unreasonably interfere[d] with the employees work performance."  *Id.*; *see also Gates v. Bd. of Educ. of the City of Chicago*, 916 F.3d 631, 636 (7th

Cir. 2019).  Moreover, the inquiry is objective, viewed from the standpoint of a reasonable person in the employee's position.  *Pennsylvania State Police*, 542 U.S. at 141.

Finally, a constructive discharge claim requires the plaintiff to show "working conditions even more egregious than that required for a hostile work environment claim, because employees are generally expected to remain employed while seeking redress, thereby allowing an employer to address a situation before it causes the employee to quit." *Chapin*, 621 F.3d at 679 (citation omitted).  Accordingly, examples of "egregious" working conditions that go beyond a hostile working environment and result in constructive discharge frequently include threats to personal safety.  *Id.*, at 679 (citing *Porter v. Erie Foods, Int'l, Inc.*, 576 F.3d 629, 640 (7th Cir. 2009) (claim for constructive discharge possible where harassment included repeated use of noose and implied threats of physical violence); *Taylor v. W & S Life Ins. Co.*, 966 F.2d 1188, 1198–99 (7th Cir. 1992) (constructive discharge where supervisor made racial jokes and brandished a firearm, held it to the plaintiff's head, then took a photo and made racial jokes about it at a staff meeting).  Thankfully, however offensive and insensitive defendants' conduct may have been, plaintiff experienced nothing approaching these actions.

The court agrees with defendants that Johnson has not presented evidence of conditions that approach this high threshold.  In particular, Johnson has not shown that he faced threats to his safety or that racial harassment was "an incessant part of the workplace environment." *See Jackson v. County of Racine*, 474 F.3d 493, 499 (7th Cir. 2007). The court does not mean to minimize the negative effects Johnson says the Lake Geneva incident or the KFG working environment had on him.  However, Johnson's continued

11

work at KFG for more than two years after the Lake Geneva incident significantly undermines his argument that the incident and environment was unbearable, particularly applying an objective test.  On this record, therefore, the court is compelled to hold that no reasonable jury could find Johnson's resignation was an appropriate response to a severe, pervasive and intolerable work environment.  Accordingly, defendants are entitled to summary judgment on his constructive discharge claim.

One final note, the court is unable to hold the jury trial in this matter on the previously scheduled May 1, 2023, date.  Therefore, trial will be Tuesday, May 9, 2023.  All other dates remain the same.

## ORDER

IT IS ORDERED that:

(1) defendants Josh Kosnick and Kosnick Financial Group, Inc.'s motion for summary judgment (dkt. #11), is GRANTED in part and DENIED in part. The motion is granted on plaintiff Dominic Johnson's constructive discharge claim, but it is denied in all other respects.

(2) Voir dire and trial is this matter will begin on Tuesday, May 9, 2023.

Entered this 22nd day of March, 2023.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge